***********
The undersigned have reviewed the record and the prior Decision and Order filed by Deputy Commissioner Glenn. The appealing party has shown good ground to reconsider the evidence, receive further evidence, and amend the Decision and Order. The Full Commission therefore REVERSES the decision of the Deputy Commissioner and enters the following Decision and Order:
 ***********
The undersigned finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement, which was admitted into the record, and marked as Stipulated Exhibit (1) as:
 STIPULATIONS
1. This action and all parties hereto are subject to the North Carolina Tort Claims Act. All parties are properly before the Industrial Commission, which has jurisdiction over the parties and subject matter.
2. The decedent, Mr. Larry Walker, was killed in a single-vehicle wreck on N.C. 343 on 20 August 1997.
3. Plaintiff alleges that defendant's negligent maintenance of N.C. 343, including, but not limited to, defendant's failure to correct dangerous highway conditions of which it knew, or should have known, and its failure to warn of dangerous highway conditions of which it knew, or should have known, was the proximate cause of the decedent's death. Plaintiff is seeking compensatory damages for the wrongful death of the decedent.
4. Defendant denies any negligence and alleges that the decedent's contributory negligence, his failing to drive his truck at a safe speed for the conditions then existing on N.C. 343, was the proximate cause of his death.
5. The decedent was born on 1 December 1959 and was thirty-six (36) years old at the time of his death.
6. The decedent's funeral and burial expenses totaled $4,372.60.
7. Line Sergeant Ray Early measured with a ruler the depth of the standing water referenced in Trooper David Putnam's investigation report related to the decedent's wreck, and the water depth measured 1/2 inch.
8. Between 14 August 1997 and 21 August 1997 defendant had sufficient funding and resources available to resurface the area of the accidents in question, and to install either or all of advisory speed limit signs, road flooding warning signs, and slippery when wet signs in the immediate area prior to the date of the decedent's accident.
 ***********
Based upon all of the competent evidence of record, the undersigned makes the following:
 FINDINGS OF FACT
1. The highway in question, N.C. 343, is a two lane paved highway running generally north-south through Camden County. In the vicinity of South Mills, U.S. 17 crosses over N.C. 343 via a raised bridge. N.C. 343 had been resurfaced in 1995. On dates of the incidents relevant to this claim, the posted speed limit on N.C. 343 in the vicinity of the U.S. 17 overpass was 55 miles per hour.
2. The U.S. 17 overpass bridge is supported by 20 concrete bridge pilings four feet in width. Ten pilings are on the east side of N.C. 343 and ten are on the west side of N.C. 343. The bridge pilings on the east side of N.C. 343 are located 25 feet from the northbound travel lane of N.C. 343. As of 20 August 1997, the bridge pilings for the U.S. 17 overpass that crosses over N.C. 343 did not have guardrails.
3. As of 20 August 1997 there were no "slippery when wet" or "road subject to flooding" or similar signs in that area.
4. A motor vehicle accident occurred on 14 August 1997 involving Luke Denison and Rebecca Gunderson. This Denison-Gunderson accident occurred in the same location and manner as the decedent's and is therefore relevant to this case. On that date, the Denison-Gundersen vehicle was traveling south on N.C. 343, and was approaching the U.S. 17 bridge when it left the roadway, and struck one of the concrete bridge pilings on the east side of N.C. 343. Both persons died as a result of this accident.
5. Trooper Goodwin investigated the Denison-Gunderson accident, which occurred following a heavy downpour in the area at issue. Trooper Ernest Goodwin, Jr. is employed by the North Carolina State Highway Patrol, and has worked in that capacity for eleven (11) years. During his career, Trooper Goodwin has investigated approximately fifty (50) automobile accidents per year. Trooper Goodwin investigated the Denison-Gundersen accident, which occurred following a heavy downpour in the area at issue. At the scene, Trooper Goodwin observed N.C. 343 to be generally wet, with water accumulating in parallel ruts in both lanes, beginning in the area of the U.S. 17 overpass bridge and extending north. Based upon his experience, Trooper Goodwin concluded that vehicle tires had worn the ruts in the road surface on N.C. 343 over time. Trooper Goodwin further observed tire tracks in the grass extending from the edge of the pavement just north of the U.S. 17 overpass bridge, leading to the Denison-Gundersen vehicle. The tire tracks, as partially shown in photographs that are part of the record marked as Plaintiff's Exhibits (1) and (4), indicated to Trooper Goodwin that the vehicle had been sideways at the time it left the road, and that it continued sideways until it struck the bridge piling. From his investigation, Trooper Goodwin concluded that the Denison-Gundersen vehicle had hydroplaned due to standing water in the roadway. Upon completion of his investigation, Trooper Goodwin did not prepare a Highway Condition Report. Under normal procedures, such reports are forwarded to defendant and can provide notice of road problems suspected by the Highway Patrol. Trooper Goodwin testified that he was never contacted by personnel of defendant regarding the Denison-Gundersen accident. Had such contact been made, Trooper Goodwin testified that he would have advised defendant that in his opinion, standing water in the southbound lane of N.C. 343 north of the U.S. 17 overpass bridge had caused the Denison-Gundersen vehicle to hydroplane.
6. Following the Denison-Gundersen accident, Trooper Ed Johnson went to the location where the Denison-Gunderson vehicle was stored to measure the tire tread depths. Trooper Johnson has been employed by North Carolina State Highway Patrol for sixteen (16) years, and has investigated hundreds of wet weather accidents involving vehicles leaving the roadway. Trooper Johnson testified that he visually inspected all four tires, but that he measured the tread depths of only the rear tires. Based upon his measurements and observations, Trooper Johnson concluded that the tires met statutory requirements.
7. Sergeant Charles Gould is a retired District First Sergeant of the North Carolina State Highway Patrol. Sergeant Gould had been employed with the State Highway Patrol for approximately twenty-seven (27) years in August 1997, and was informed of the Denison-Gundersen accident on the night it occurred. The following day, on Friday, 15 August 1997, Sergeant Gould telephoned Mr. Jerry Jennings, then working as defendant's District Engineer, and informed him of the accident. During his deposition, Sergeant Gould testified that he could not recall exactly all that he had said to Mr. Jennings during this phone conversation, but that he believed he had mentioned standing water being present at the accident scene. Sergeant Gould had not been to the accident scene, and had not seen a Highway Patrol accident report at the time he spoke with Mr. Jennings.
8. Mr. Jerry Jennings is a certified, professional engineer and was defendant's District Engineer for the First District of Division One in August 1997. In that capacity, Mr. Jennings's responsibilities included ordering or making road maintenance recommendations, and installing warning signs in Camden County. In his position, Mr. Jennings regularly received reports from the State Highway Patrol and private citizens concerning road conditions. Subsequent to his conversation with Sergeant Gould, Mr. Jennings telephoned his superior, Mr. Don Conner, defendant's Division Engineer, and advised him of Sergeant Gould's report of the Denison-Gundersen accident. During the conversation with Mr. Connor, Mr. Jennings reported that Sergeant Gould questioned the need for guardrails to buffer the bridge piers. When the original designs for the U.S. 17 overpass project were reviewed by Mr. Jennings, he determined that guardrails were not specified at the time of its construction. Nonetheless, in their discretion, Mr. Jennings and Mr. Connor decided to pursue funding for the installation of guardrails. Mr. Jennings was not instructed by Mr. Conner to inspect the Denison-Gundersen accident scene, and he did not suggest to Mr. Conner that a formal inspection was needed.
9. Prior to the decedent's accident on 20 August 1997, area newspapers published articles regarding the Denison-Gundersen accident. The Daily Advance, a newspaper from Elizabeth City, published such an article on Friday, 15 August 1997. That article was on the front page, and accompanied a headline reading "Two teens die in Camden car wreck." The article noted that the Denison-Gundersen vehicle was southbound on N.C. 343 when it went off of the left side of the road, and struck a piling supporting the U.S. 17 overpass bridge. The article cited an unnamed highway patrol spokesperson who indicated that the accident was caused by the "rain-slickened road" and that excessive speed was not a factor. On 16 August 1997, The Virginian Pilot from Norfolk Virginia published an article on the front page of its North Carolina section with a headline reading "Teens Die After Car Wreck Speeding and Alcohol Are Not Involved, Officials Say." This article quoted Sergeant Gould, who stated that the Denison-Gundersen vehicle "apparently hit a pool of water" on N.C. 343, and then hit a bridge piling supporting the U.S. 17 overpass bridge. On 17 August 1997, The Daily Advance ran a second related article which also quoted Sergeant Gould, who stated that prior to striking a bridge piling, the vehicle had "apparently hydroplaned."
10. On Monday, 18 August 1997, Mr. Jennings went to the scene of the Denison-Gundersen accident. On that day, the weather was sunny, and the road surface was dry. No definitive evidence has been produced to establish that Mr. Jennings had knowledge of the road conditions exiting when the Denison-Gundersen occurred on the date of his visit to the scene. Mr. Jennings testified that he did not go to the scene to perform a formal investigation, but had other tasks in that area, and went to the scene to determine if there were obvious road defects that could have contributed to the accident. Mr. Jennings did not look for rutting in the road surface, but did look for low shoulders and potholes. During his visit, Mr. Jennings observed tracks in the grass, and was able to determine the area of N.C. 343 where the vehicle had been prior to leaving the road. Although Mr. Jennings testified that an analysis for rutting would not have taken much time, the only measurement he made at the scene was the distance between the pavement and the concrete bridge pilings on the east side of the road. Prior to the decedent's accident, Mr. Jennings did not request any additional inspections by defendant's personnel of the Denison-Gundersen accident scene. Neither prior to 18 August 1997, nor between that time and the decedent's accident, did Mr. Jennings gather further information about the Denison-Gundersen accident or obtain an accident report. During the hearing, Mr. Jennings testified that in his opinion, there was not an urgent need to conduct an immediate formal inspection of the Denison-Gundersen accident scene.
11. In August 1997, Mr. Raymond Skinner was defendant's County Maintenance Engineer for Camden County and three other counties, and was directly supervised by Mr. Jennings. Mr. Skinner had been employed by defendant since 1961. His duties as a County Maintenance Engineer included the scheduling of road maintenance, coordinating road surface patching jobs, and responding to drainage complaints. Mr. Skinner learned of the Denison-Gundersen accident through reading newspaper articles. On 18 August 1997, he and Mr. Jennings discussed the Denison-Gundersen accident. Between the time of the Denison-Gundersen accident and the decedent's, Mr. Skinner did not visit the accident scene, and was not requested to do so by his superiors. In August 1997, Mr. Skinner was the direct supervisor of Mr. Robert Winslow, who was defendant's Transportation Supervisor III for Camden County at that time. Between the time of the two accidents at issue, Mr. Skinner did not request Mr. Winslow, or others he supervised, to inspect the scene of the Denison-Gundersen accident, and testified that he was unaware that Mr. Winslow had visited the accident scene.
12. As of August 1997, Mr. Robert Winslow had been employed by defendant as a Transportation Supervisor III in Camden County for four (4) years, and he had been employed by defendant for a total of seventeen (17) years. His job duties in August 1997 included scheduling maintenance for roads in Camden County, and taking complaints from the general public concerning drainage and potholes. Mr. Winslow, testified that some time after the Denison-Gundersen accident, but prior to the decedent's accident, he went to accident scene. Mr. Winslow had learned of the Denison-Gundersen accident through a conversation at work. Mr. Winslow testified that he went to the scene out of curiosity, and not as part of a formal investigation. Mr. Winslow's visit to the scene consisted of him driving a short distance north of the U.S. 17 overpass bridge, then returning under the bridge, and parking his vehicle. Mr. Winslow then walked around the immediate area, and found no significant roadway defects. The road surface was dry on the day of his visit, and Mr. Winslow was not aware that the Denison-Gundersen accident had involved wet weather, or that the vehicle was suspected of hydroplaning. Following the decedent's accident, Mr. Winslow documented his visit to the scene in a memorandum, which is part of the record, marked as Defendant's Exhibit (1).
13. At approximately 4:10 p.m. on Wednesday, 20 August 1997, the decedent was driving his 1984 Ford Ranger light duty truck south on N.C. 343. The decedent's home was in South Mills, North Carolina, and he was traveling from his job in Norfolk, Virginia. The decedent had traveled daily to and from work on N.C. 343 for several years prior to that date. As the decedent approached the U.S. 17 overpass bridge, his vehicle spun across and off of the road, and into a concrete bridge piling on the east side of N.C. 343. Credible evidence of record supports the finding that prior to the decedent's vehicle leaving the roadway, it had been traveling in the same lane, direction and in the same general area as the Denison-Gundersen vehicle had been prior to that accident. The speed of the decedent's vehicle propelled it eighty-six (86) feet before it collided with the bridge piling. Evidence showed that there had been heavy rains around the time of this accident.
14. Mr. Gary McCoy was also traveling from Virginia around the time of the accident, and testified as to his observations. Because of the rain, Mr. McCoy testified that he had slowed down, and that the decedent's vehicle had passed him on U.S. 17 just before exiting onto N.C. 343. Mr. McCoy further testified that once on N.C. 343, he observed the tail lights of the decedent's vehicle disappear. Upon reaching the U.S. 17 overpass, Mr. McCoy observed the decedent's vehicle resting near a bridge piling. No witness, including Mr. McCoy, observed decedent losing control of his vehicle, or the vehicle leaving the roadway. As for the road surface, Mr. McCoy observed water standing in parallel ruts in the southbound lane of N.C. 343 in the same area where the decedent's taillights had disappeared, which was approximately 50-75 yards north of the bridge pilings. Additionally, Mr. McCoy testified that the ruts were the approximate width of a vehicle's tires, and that prior to 20 August 1997, he had observed ruts in the vicinity of the accident, even on dry days.
15. At the time of the hearing, Mr. Tony Perry was the Sheriff of Camden County, and was the Chief Deputy Sheriff for Camden County in August 1997. Sheriff Perry responded the decedent's accident on 20 August 1997, and at the scene observed rutting in the road surface in which water had accumulated. This rutting was in the southbound lane of N.C. 343, in the area where the Denison-Gundersen and the decedent's vehicles left the roadway. Because this was the second accident at this location, through the emergency dispatcher, Chief Deputy Perry contacted defendant and requested that an engineer come to the scene because of the road surface conditions, and to determine the need for warning signs.
16. Following the decedent's accident, Mr. Jennings was also called to the scene. With the benefit of the current heavy rain at the time, Mr. Jennings was able to observe water standing in ruts that extended from the U.S. 17 overpass bridge north approximately 100 yards. At the hearing, Mr. Jennings testified that the ruts he observed on 20 August 1997 would have been present during his visit to the scene on 18 August 1997, and that the rutting was such that he probably would have seen it had he been looking for it during his prior visit. Based upon his observances on 20 August 1997, Mr. Jennings telephoned Mr. Conner, and it was decided that the portion of the roadway in question should be resurfaced. Mr. Jennings then called Mr. Skinner and instructed him to repave that area of N.C. 343 as soon as possible.
17. Trooper David Putnam is employed by the North Carolina State Highway Patrol, and has worked in that capacity for 10 years. During his career, Trooper Putnam has investigated between 85 and 100 vehicle accidents per year, and on 20 August 1997, Trooper Putnam was called to the decedent's accident. During his investigation, Trooper Putnam observed four tire tracks in the grass extending from the edge of the pavement to the decedent's vehicle. These tracks are shown in photographs that are part of the record, marked as Plaintiff's Exhibit (13). Trooper Putnam also observed water accumulations in parallel ruts in the southbound lane of N.C. 343 extending north from the U.S. 17 overpass bridge. This area is shown in photographs that are part of the record, marked as Plaintiff's Exhibits (14-17). Trooper Putnam and another trooper measured the water accumulations in each of the grooves, and the parties have stipulated that the water depth measured 1/2 inch. From his investigation, Trooper Putnam concluded that the decedent's vehicle was traveling southbound on N.C. 343 when its rear end slid to the right, that it left the roadway sideways and continued sliding sideways until it hit the bridge piling on the east side of the road, approximately 86 feet south of where it left the roadway. Trooper Putnam entertained four possibilities as to how the accident had occurred. The first was that the decedent's vehicle hydroplaned off of the road. The second was that the decedent lost control of his vehicle, ran off the road to the right, over-corrected, and then came back across the road, and off of the road to the left. The third was that the decedent suddenly and forcefully applied brakes, and lost control of his vehicle on the wet road. The fourth possibility was that the decedent suffered a medical emergency that caused him to lose control of his vehicle.
18. Trooper Putnam's opinion as to the cause of the decedent's accident was raised as a crucial issue at the hearing before the Deputy Commissioner, with plaintiff highlighting references to hydroplaning and standing water, and defendant highlighting references to the lack of tire tread depth. In his final report, Trooper Putnam notes that the decedent's vehicle had hydroplaned "due to water standing in the roadway." This notation is found on page (2) of Defendant's Exhibit (4). Trooper Putnam also concluded that the tire tread depths of the decedent's vehicle were within the statutory requirements set forth in N.C. Gen. Stat. § 20-122.1.
19. Defendant contends that the decedent's actions, or inactions constituted contributory negligence in relation to the accident resulting in his death on 20 August 1997. There were no eyewitnesses to this accident, and no competent witness testimony regarding the speed of the decedent's vehicle at the time it left the roadway was offered. Additionally, although defendant contends that the decedent was operating his vehicle with unsafe tires, the evidence of record establishes that his vehicle's tire tread depths complied with statutory requirements.
20. Based upon the totality of the credible evidence of record, the Full Commission finds that there were no actions or inactions on the part of the decedent that constituted contributory negligence in relation to the incident resulting in his death on 20 August 1997.
21. Defendant had, and has a duty to plan, construct, operate and maintain its roadways in a reasonable manner for the safety of the traveling public. Defendant also has a duty to warn of hazardous roadway conditions that it has, or should reasonably have had notice or knowledge of. These duties applied to the section of N.C. 343 and the U.S. 17 overpass bridge involved in this matter.
22. The manner and timing of defendant's investigation of the Denison-Gundersen accident scene and the relevant road surface conditions, and its relation to the decedent's accident has been raised as an issue in this case. When a fatal vehicle accident occurs, defendant's established procedure is for the Area Traffic Investigation Engineer to perform a formal investigation, and make any necessary recommendations for road repairs. The Area Traffic Investigation Engineer for the roads in question in 1997 was Mr. Haywood Daughtry. At the hearing, Mr. Daughtry testified that defendant's formal investigation of fatal accidents begins with obtaining a copy of the State Highway Patrol Report to determine the road conditions at the time of the accident. Regarding such reports, Sergeant Gould testified that it normally takes several days after an accident for a Highway Patrol Report to be completed. Under normal circumstances Mr. Daughtry testified that his office receives information regarding vehicle accident fatalities through formal reports within 30 days of the accident. Mr. Daughtry further testified that if he receives a request to investigate a fatal accident site prior to completion of the official report, he would investigate that site as soon as possible, and that he would obtain a working copy of official Highway Patrol Report the for use in that investigation. According to Mr. Daughtry, an Area Traffic Investigation Engineer's investigation involved visiting the scene and verifying all of the relevant distances. The investigator would also ride, and walk through the scene, looking for any possible roadway or signing deficiencies. The investigator would then review the accident history of the area of road in question to determine if there are any significant accident patterns. Mr. Daughtry received notification of the Denison-Gundersen accident in September 1997, so at the time he investigated the scene, the road had been resurfaced and guardrails had been installed.
23. Through his employment with defendant, Mr. Jennings was aware of the Area Traffic Engineer's role in the investigation of fatal accidents, and of the time involved for the that office to receive formal notification of such accidents through the normal reporting process. Following the Denison-Gundersen accident, Mr. Jennings did not immediately contact, or request that Mr. Conner immediately contact the Area Traffic Engineer's office to report that accident. Instead, the credible evidence of record establishes that the Area Traffic Engineer's office was notified of the Denison-Gundersen accident through the normal reporting process. Additionally, following the Denison-Gundersen accident, Mr. Jennings did not take the proactive measures of obtaining a working copy of the Highway Patrol Wreck Report, or contacting Trooper Goodwin directly to ascertain the road conditions existing at the time of that accident. On 21 August 1997, Mr. Skinner and Mr. Winslow visited the scene of the accidents at issue. On the date of their visit, the weather was dry and sunny. Mr. Skinner, visually inspected the pavement in the area of N.C. 343 where the two vehicles involved in these accidents had left the roadway, and observed wheel ruts in the southbound lane from the U.S. 17 overpass bridge approximately 100 yards north of the bridge. Based upon his experience and inspection of the scene, Mr. Skinner concluded that the rutting he observed was the only road surface condition that would have caused the accumulation of water in the southbound lanes of N.C. 343.
24. On 23 August 1997, Trooper Putnam prepared a Highway Condition Report, which is part of the record, marked as Defendant's Exhibit (8). Included in that report was Trooper Goodwin's expressed concern regarding the lack of guardrails protecting the U.S. 17 overpass bridge pilings. Given that N.C. 343 had been resurfaced on 22 August 1997, rutting was not referred to in the report.
25. On 27 August 1997, Mr. Jennings composed a memorandum documenting what he was informed by Sergeant Gould on 15 August 1997. In this memorandum, Mr. Jennings notes that during the telephone call he was informed of the Denison-Gundersen accident, that the driver of the vehicle involved had lost control during daylight hours in the rain, and that the vehicle had struck the bridge supports of U.S. 17. Regarding the decedent's accident, the memorandum notes that there were no apparent roadway deficiencies, but also notes that standing water (1/4) to (1/2) inches deep was measured on the road immediately after the decedent's accident.
26. In the performance of its duties to the traveling public, defendant routinely performs surveys of pavement conditions of road conditions across the state every two years. These surveys are used by defendant in prioritizing the resurfacing and maintenance of state roadways.
27. Mr. Ernie Mallard was accepted by the Deputy Commissioner as an expert witness in highway design, highway engineering and accident reconstruction. Mr. Mallard testified that N.C. 343 in the area of the decedent's and the Denison-Gundersen accidents was, in his opinion, a defective and an unreasonably dangerous section of highway. As explained, Mr. Mallard's opinion was based upon rutting in the southbound lane which could hold as much as (1/2) inch of water in a fifty-five (55) miles per hour speed zone in close proximity to concrete bridge pilings without the presence of any signage to warn the traveling public. In Mr. Mallard's opinion, the defective condition of the section of N.C. 343 in question was a proximate cause of the decedent's accident.
28. According to Mr. Mallard, standing water in ruts on a roadway can cause two types of hazard for the traveling public. The first is that water standing in ruts creates a risk of hydroplaning. The second hazard posed by standing water in ruts is that it creates uneven forces on a vehicle's tires, which can result in the vehicle going into an out-of-control spin. Mr. Mallard testified that ruts holding water create a type of hidden danger because even if the water is seen, a motorist cannot determine the depth of the water in the rut. Additionally, Mr. Mallard opined that the rutting on the area of N.C. 343 should have been visible to Mr. Jennings and Mr. Winslow during their visits to the scene following the Denison-Gundersen accident. Mr. Mallard further testified that rutting of any amount presented a dangerous condition, and that only zero rutting was acceptable. As for the lack of guardrails, Mr. Mallard testified that presence of unprotected concrete bridge piers located twenty-five (25) feet off the pavement increased the risk of danger posed by this section of N.C. 343 because this heightened the severity of the consequences of vehicles leaving the road.
29. Mr. Harold Landis Satterwhite, Jr. was accepted by the Deputy Commissioner as an expert in defendant's policies and procedures concerning the maintenance of highways, and investigations of accident scenes. Mr. Satterwhite was also accepted as an expert regarding highway engineering, and the standard of care, duties and responsibilities of defendant's District Engineers and Area Traffic Engineers. Mr. Satterwhite testified that in his opinion, the area of N.C. 343 at issue constituted an unreasonably dangerous road because of the posted speed limit, the extent of rutting and its potential to hold water, and the unprotected concrete bridge pilings. According to Mr. Satterwhite, the standard of care for a District Engineer requires that he or she maintain safe roadways within their district. Fulfilling that duty requires a District Engineer to properly supervise their subordinates who are to observe, inspect and maintain roads in the district on a regular basis. The District Engineer is also responsible for inspecting, or having his subordinates inspect, potential roadway defects reported to their office. Mr. Satterwhite further testified that defects of which the District Engineer's Office had knowledge of should be repaired immediately, although he admitted that the defendant did not have sufficient resources to repair all rutting or other defects. As for standing water, Mr. Satterwhite testified upon notification of roadway conditions giving rise to the possibility of water accumulations, defendant's highway engineers have a duty to respond to that immediately by inspecting the roadway for defects, and then correcting found defects as quickly as possible. Until such time as a known defect can be repaired, Mr. Satterwhite testified that defendant has a duty to immediately warn the traveling public.
30. According to Mr. Satterwhite, Sergeant Gould's telephone call to Mr. Jennings on 15 August 1997 created a duty for Mr. Jennings to immediately conduct, or have a subordinate immediately conduct a reasonable inspection of the accident scene to determine whether roadway defects were present. Mr. Satterwhite further opined that given the manner and timing of Mr. Jennings' visit to the accident scene on 18 August 1997, that Mr. Jennings breached his duty as a District Engineer to conduct, or to have subordinates, such as Mr. Skinner or Mr. Winslow, conduct a reasonable inspection. As a basis for this opinion, Mr. Satterwhite testified that upon visiting the scene, Mr. Jennings should have specifically looked for rutting, and that had he conducted a reasonable inspection, the rutting in the southbound lane of N.C. 343 would have been visible.
31. Mr. Michael A. Sutton was accepted by the undersigned as an expert in accident reconstruction, accident analysis, and automotive dynamics. Mr. Sutton testified that hydroplaning can occur in levels of standing water as shallow as 1/10th of an inch given the combination of tire properties on the vehicle involved. Those tire properties include tire speed, tire tread depth, tire inflation pressure and the width of the tire in contact with the road. Mr. Sutton further testified that hydroplaning can occur at speeds as low as 45 miles per hour. Regarding the decedent's accident, Mr. Sutton opined that the decedent's vehicle, given its size and the condition of its tires, could have hydroplaned in standing water as shallow as (2/10ths) of an inch.
32. Pursuant to its own policies and procedures, defendant has a duty to facilitate repairs as soon as possible of known roadway conditions or defects that present a risk of harm to the traveling public.
33. During the hearing, defendant waived its objection regarding the introduction of evidence of its remedial measures, and the record establishes that the resurfacing of the area of N.C. 343 at issue was completed on 22 August 1997, the project being completed within a period of time shorter than the period between the two accidents in question.
34. Defendant had notice of an existing defect or dangerous road condition prior to the decedent's accident on 20 August 1997. Defendants did not timely repair the dangerous condition or provide signage to warn the traveling public about the dangerous condition.
35. Defendant has a duty to provide and maintain safe road conditions and to provide warnings for dangerous conditions. Defendant breached this duty with regard to the existing road conditions present at the time and place of decedent's accident on 20 August 1997.
36. Defendant's breach of duty caused the decedent's accident of 20 August 1997 and his resultant death.
 ***********
The foregoing findings of fact engender the following:
 CONCLUSIONS OF LAW
1. On 20 August 1997, the negligence of defendant's named employees was the proximate cause of decedent's injuries and death. N.C. Gen. Stat. §143-291 et seq.
2. There were no actions or inactions on the part of the decedent that constituted contributory negligence in relation to the incident resulting in his death on 20 August 1997. N.C. Gen. Stat. § 143-291 et seq.
3. Because of the negligence of defendant's named employees, the State is liable to the plaintiff in this case in the amount of $500,000.00.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. The State shall pay the plaintiff the sum of $500,000.00.
2. The State shall pay the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________________ THOMAS JEFFERSON BOLCH COMMISSIONER
DISSENTING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER